# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

WALTER CHRUBY,

  Plaintiff,

   v.

KIRK BEARJAR, et al.,

  Defendants.

CIVIL ACTION NO. 3:17-cv-01631

(MANNION, J.)
(SAPORITO, M.J.)

## <u>MEMORANDUM</u>

Now before the Court are two motions by the DOC Defendants.[1] The DOC Defendants have moved to transfer this civil action to the United States District Court for the Western District of Pennsylvania, pursuant to 28 U.S.C. § 1391 and 28 U.S.C. § 1404(a). (Doc. 15; *see also* Doc. 16). They have also moved to sever this case into three separate actions, each limited to the events occurring at one of three correctional institutions, pursuant

---

[1] The DOC Defendants are several officials with the Pennsylvania Department of Corrections: Kirk Bearjar, a Unit Manager at SCI Laurel Highlands; Annette Kowalewski, the Correction Health Care Administrator at SCI Laurel Highlands; Jennifer Schrock, a Registered Nurse Supervisor at SCI Laurel Highlands; Jamey Luther, the Superintendent at SCI Laurel Highlands; Stephanie Wood, the Correction Health Care Administrator at SCI Pittsburgh; Karen Feather, the Correction Health Care Administrator at SCI Mercer; and John E. Wetzel, in his official capacity as Secretary of the Pennsylvania Department of Corrections.

to Rule 21 of the Federal Rules of Civil Procedure. (Doc. 17; *see also* Doc. 18). The plaintiff opposes both motions. (Doc. 26; Doc. 27). Meanwhile, the Medical Defendants[2] have apparently taken no position on these motions, filing no briefs in response.

For the reasons stated herein, the motions will both be denied.

## I. FACTUAL BACKGROUND[3]

The plaintiff is a convicted prisoner serving a life term. He has been incarcerated at various state correctional facilities in Pennsylvania since 1997. Since before his incarceration, he has been suffering from a serious,

---

[2] The Medical Defendants are: Correct Care Solutions, L.L.C. ("Correct Care"), a for-profit business that provided medical services to inmates at various state prisons under contract with the Pennsylvania Department of Corrections; John Stramat, M.D., a physician who provided medical care to inmates at SCI Pittsburgh and SCI Mercer under this contract; Josh Shola, a health services administrator at SCI Pittsburgh and SCI Mercer under this contract; and Scott Morgan, M.D., a physician who provided medical care to inmates at SCI Mercer under this contract. We note that an additional physician-defendant, Robert Valley, M.D., is named in the complaint and alleged to be an employee of Correct Care, but counsel for the Medical Defendants have not entered appearances on behalf of Dr. Valley, and there is nothing in the record to indicate that he has been served with original process.

[3] We note that this recitation of facts is based solely upon the allegations of the complaint, the documents attached thereto, and facts subject to judicial notice, such as publicly available court records. The parties have not submitted any evidence in connection with these two motions.

chronic, and life-threatening medical condition.

In 1988, Chruby required a bilateral renal autotransplantation—a surgical procedure involving the removal of both kidneys and replacing them in a different anatomical location. In 1989, Chruby was diagnosed with severe acute pyelonephritis and related urological conditions, requiring removal of his "transplanted" left kidney, leaving him wholly dependent on the continued function of his remaining right kidney. The location of Chruby's transplanted right kidney—in the lower right quadrant of his abdomen, outside the protection afforded by his rib cage under normal anatomical conditions—renders it vulnerable to injury from physical contact. His renal condition also makes him highly susceptible to serious infections, which in turn can aggravate the medical risks he already faces as a result of having only one kidney.

Chruby also suffers from urethral stricture disease, with multiple areas of narrowing of the tube through which urine is passed, a condition caused by chronic urinary tract infections and scarring due to long-term, repeated catheterization—Chruby must undergo this process multiple times each day to drain his bladder of post-void residual urine. Chruby's stricture disease has required multiple medical procedures, and it has

resulted in symptoms including stress incontinence, bladder leakage, reflux of urine into the kidney, and urinary stasis within the urethra, all of which contribute to his infection rate due to exposure to community acquired bacteria. Chruby suffers from the kinds of severe, chronic infections attendant to his renal and urological conditions, including urethral stricture disease, acute febrile pyelonephritis, urosepsis, severe urosepsis, septic shock, acute kidney injury, and extremely frequent urinary tract infections, with fever and other severe symptoms.

In addition, Chruby has been diagnosed with serious cardiovascular disease, an arterial blockage, and a myocardial infarction following a medically necessary coronary artery bypass graft, which he received while incarcerated.

The plaintiff's medical conditions have required—and continue to require—particular environmental conditions and specialized medical protocols and regimens to avoid the exacerbation of his medical conditions, as well as extensive hospitalizations, the suffering of extreme pain, and a serious related risk of death.

Each of the defendants is personally aware of Chruby's health conditions and medical needs. In August 2007, in settlement of a prior

lawsuit, Chruby and certain defendants and their predecessors entered

into a settlement agreement that contained the following provisions:

13. Acute Medical Care

It is understood and agreed and acknowledged by the parties that when medical evaluation reveals that Plaintiff has an acute kidney stone episode or a pyelonephritis that Prison Health Services, Inc. shall send Plaintiff to a tertiary care facility for evaluation and treatment. The DOC shall ensure that any successor to PHS understands and accepts the obligation set forth in this paragraph.

. . . .

15. Inmate Housing

At the time of the execution of this Settlement Agreement and General Release, the Plaintiff is currently sentenced to life in prison, without parole. For as long as Plaintiff remains incarcerated within the Pennsylvania Department of Corrections, the Pennsylvania Department of Corrections agrees to house Plaintiff at State Correctional Institution at Laurel Highlands, Pennsylvania, so long as the Facility remains open, Plaintiff remains misconduct free and maintains at least his current custody level 3.

(Doc. 1-7, at 6–8). The settlement agreement was executed on behalf of

several parties that earlier lawsuit, including (1) Jeffrey Beard, defendant

Wetzel's predecessor as Secretary of the Pennsylvania Department of

Corrections; (2) Prison Health Services, Inc., defendant Correct Care's

predecessor as prison healthcare services contractor for the Pennsylvania

Department of Corrections; and (3) defendant Annette Kowalewski. The settlement agreement was signed by Beard and by a representative of Prison Health Services, Inc.[4]

To implement the tertiary care provision in Paragraph 13 of the settlement agreement, prison medical officials have promulgated a succession of written medical protocols, each of which has provided that, if Chruby presents with specified symptoms, he is to be hospitalized. For example, at the time of the settlement agreement, the following medical protocol had been promulgated by Dr. Jawad Salameh, medical director of the prison where Chruby was incarcerated, addressed to all healthcare providers at SCI Laurel Highlands:

> Chruby has the following health problems:
>
> 1. History of recurrent renal stone formation.
>
> 2. Solitary right autotransplant kidney.

---

[4] We note that Chruby does not assert a state-law breach of contract claim arising out of the settlement agreement. This Court has twice previously considered and dismissed such claims for lack of subject matter jurisdiction. *See Chruby v. Beard*, No. 1:09-CV-01641, 2015 WL 164829 (M.D. Pa. Jan. 13, 2015) (Mariani, J.); *Chruby v. Beard*, No. 3:CV-05-2397, slip op. (M.D. Pa. Mar. 15, 2010) (Nealon, J.). The text of the settlement agreement appears to be proffered in this case not to support a state-law breach of contract claim, but rather to establish the defendants' knowledge of Chruby's specific medical needs, including housing accommodations.

3. Recurrent UTIs.

4. CAD s/p CABG.

This is a management guideline for Mr. Chruby to cover some aspects of the medical conditions he is suffering from. Please use your discretion and refer to these guidelines in dealing with Mr. Chruby.

A. UTI

1. Symptoms of a UTI with no fever. Get a UA for culture the same day.

2. Fever up to 101 (>99). Get a UA for culture and start empiric antibiotic prescription with Cipro 500 mg PO BID for 7 days.

3. Fever >101. Obtain UA for culture, blood cultures, and start IV antibiotics. Cipro 400mg IV q 12 hours. (Preferred to be a hospital admission.)

B. Pain

1. Patient to [be] maintained on PO Vicodin PRN.

2. For acute pain (urinary colic or passing stone), give Demerol 50mg IM PRN every 4 hours.

C. Allergy

1. Patient is allergic to Morphine and NSAIDS.

D. Stones

1. Continue Thiazides and Urocrit to prevent stone formation.

E. BPH

     1. Continue on Flomax.

     2. If patient develops obstructive symptoms of BPH, then refer to UPMC urologist Dr. Maranchie.

   F. CAD

     1. C/O chest pain, need to see patient and evaluate him, get an EKG, and appropriately referred if needed.

Whenever patient has any complaints he needs to be seen by MD and the encounter needs to be documented. Any questions or concerns please consult with Dr. McGrath or Dr. Noel.

(Doc. 1-8, at 3).

On September 7, 2016, shortly before the earliest events giving rise to Chruby's claims in this litigation, defendant Kowalewski promulgated the following medical protocol, addressed to all nursing staff at SCI Laurel Highlands:

If [Chruby] has any of the following related to renal issues:

- Pain in lower right abdomen or pelvic area

- Blood in urine

- Cloudy urine

- Burning urine

- Pressure in pelvic area or right lower abdomen

- Temperature of 99 degrees or above

- Nausea or vomiting

You are to do the following:

1. Bring Mr. Chruby back to one of the out-pt exam rooms within 15 minutes upon arrival to out-pt.

2. Go to Sapphire under Churby [*sic*] protocol: Pre-admit for fever, nausea, pain and urine and follow these orders:

   - Temp- Tylenol 650 mg for temp of 99 or above x one dose

   - Nausea or vomiting – Zofran 4mg IM x one dose

   - Pain- Demerol 50mg IM x one dose

   - Do urine, clean catch for urinalysis and culture and sensitivity and send to SCH Stat. (Does not cause inmate transport delay)

   Posted in main pharmacy are the directions on exactly how to access Sapphire for documentation. NO ADDITIONAL orders are needed for these STANDING orders.

   NOTE: Common sense check: If he has no pain you do not give the Demerol. If he has no temp you give no Tylenol, etc. Patient subjective driven regime.

   You will find these meds in a light blue bin labeled in red "Churby [*sic*] protocol." This box is locked in the narcotics drawer in the main pharmacy.

3. Contact Dr. Dancha for further orders/directions.

   4. CHCA [Kowalewski] is to be notified immediately, via phone, if not sent out. An email is acceptable if he is being transported.

(Doc. 1-6, at 2).

On October 13, 2016, notwithstanding the terms of the 2007 settlement agreement, Chruby was transferred from SCI Laurel Highlands to SCI Pittsburgh. On December 7, 2016, a substantively similar medical protocol was promulgated to the nursing staff of SCI Pittsburgh by defendant Wood:

If [Chruby] has any of the following related to renal issues:

- Pain in lower right abdomen or pelvic area

- Blood in urine

- Cloudy urine

- Burning urine

- Pressure in pelvic area or right lower abdomen

- Temperature of 99 degrees or above

- Nausea or vomiting

You are to do the following:

   1. Call EMS STAT for Transport to UPMC Shadyside Hospital.

1.5 Call Shift Commander STAT

2. Follow protocol in Sapphire: Pre-admit for fever, nausea, pain and urine and follow these orders:

   - Temp- Tylenol 650 mg for temp of 99 or above x one dose

   - Nausea or vomiting- Zofran 4mg IM x one dose

   - Pain- Demerol 50mg IM x one dose

NO ADDITIONAL orders are need [*sic*] for these STANDING orders

NOTE: If he has no pain, you do not give the Demerol. If he has no temp you do not give Tylenol, If he have [*sic*] nausea, but no vomiting-Give the Zofran

The Demerol and Zofran are in the Drug room, the Zofran is where all the IM Medications are stored and the Demerol is in the locked cabinet

Notify the CHCA [Wood] immediately if not set out. An email is acceptable if he is being transported.

(Doc. 1-8, at 2).

In addition, from time to time outside health providers have furnished the plaintiff's counsel with letters specifically addressing the medical requirements for Chruby's care, each of which has been forwarded

to the defendants or other relevant administrative personnel.[5] A July 10, 2009, letter from Jodi K. Maranchie, M.D., the plaintiff's treating urologist, opined that his access to a clean, private toilet and sink would minimize his infections, which is not only important to preserving remaining renal function, but also to minimizing hospital transfers and the extended use of broad-spectrum antibiotics. (Doc. 1-5, at 2). An August 1, 2016, letter from Matthew Davidson, D.O., a surgeon, opined that, based on a review of Chruby's medical records, single-cell housing was medically necessary to limit the risk of recurrent infections. (Doc. 1-2, at 2–4). An August 25, 2016, letter from Mang Chen, M.D., the plaintiff's treating reconstructive urologist, opined that single-cell housing was medically necessary to avoid the risk of life-threatening infections and the risk of renal failure. (Doc. 1-2, at 5). An October 5, 2016, letter from Paul Rusilko, D.O., a urologist, opined that, based on a review of Chruby's medical records, it was in his best interest to provide a clean environment for self-catheterization to reduce the risk of infection that might damage his solitary kidney. (Doc. 1-4, at 2). An October 10, 2016, letter from Robert C.

---

[5] Based upon the allegations of the complaint, it is unclear precisely when each of the letters was conveyed to prison officials.

Eyre, M.D., a urologist, opined that, based on a review of Chruby's medical records, single-cell housing was critically important to reduce the risk of frequent and severe infections requiring hospitalization. (Doc. 1-3, at 2).

During his incarceration, Chruby generally has been compliant with institutional rules and cooperative with prison officials. He has, however, filed numerous administrative grievances concerning the conditions of his confinement, and he has filed or participated in several federal and state lawsuits regarding the same.[6]

As a result of his grievance and litigation activity, Chruby alleges that defendant Bearjar retaliated against him. On or about January 14, 2016, while incarcerated at SCI Laurel Highlands, Chruby wrote a letter to defendant Luther, the prison superintendent, requesting to be moved to a single cell which he was aware would soon be open and available. Luther instructed Chruby to coordinate with his unit manager, defendant Bearjar, who allegedly evaded Chruby until he reached out to Luther again.

On February 3, 2016, Chruby was moved into the open single cell, as requested. In the preceding four to six weeks, while he was housed with a

---

[6] The complaint itself contains dates and descriptions for each grievance, and the caption and docket number for each lawsuit.

cellmate, Chruby had contracted serious community-acquired infections requiring medical treatment, including urinary tract infections and staph infections (including MRSA) of his skin.

On or about February 22, 2016, when Chruby requested to take written materials to his attorneys to prepare for his deposition in an unrelated lawsuit, Bearjar said to Chruby: "You are a little overzealous with your litigation, aren't you?" and "You cost the DOC a great deal of money." On or about February 23, 2016, Bearjar waved a handful of emails in front of Chruby and said, "I'm sick of getting these emails," and "I'm putting a bed in your room as soon as possible, and we are going to put someone really special in there with you."

On February 26, a 92-year-old, frail, dependent, and ill inmate in a hospital bed was moved into Chruby's cell. Chruby alleges that he was placed or caused to be placed there by defendants Bearjar, Luther, Kowalewski, and Schrock. During the 23-day period when he was single-celled, Chruby had not experienced any new serious medical issues. Following placement of the ill inmate in his cell, Chruby again experienced serious health complications, including infections and hospitalizations for the following periods: April 1–6, 2016; May 7–13, 2016; June30–July 7,

2016; July 28–August 5, 2016; August 27–September 1, 2016; and September 29–October 6, 2016.

On October 13, 2016, notwithstanding the terms of the 2007 settlement agreement, Chruby was transferred from SCI Laurel Highlands to SCI Pittsburgh. In his complaint, Chruby acknowledges that he received a single misconduct in 2009 for writing a letter questioning the conduct of a prison nurse who had told Chruby he was "doodling" on Chruby's medical records.[7] Chruby was charged with lying to a prison employee. Chruby contested the misconduct through the grievance appeals process and in a federal lawsuit. *See generally Chruby v. Kowaleski*, Civil Action No. 11-225J, 2012 WL 12875987 (W.D. Pa. June 5, 2012), *aff'd*, 534 Fed. App'x 156 (3d Cir. 2013). Despite this misconduct, Chruby was not transferred until seven years later, and the misconduct was only cited by prison officials in response to his subsequent grievance. Moreover, Chruby alleges that the Department of Corrections stated in a September 14, 2016, letter that it had abided and would continue to abide by the 2007 settlement agreement notwithstanding any misconducts incurred by

---

[7] Chruby believed the nurse was making "phantom" entries in the medical record.

Chruby in the past.

Chruby alleges that his transfer was approved by defendant Luther, and that a related grievance about the transfer was dismissed with Luther's knowing approval and endorsement. He further alleges that it was based on the false premises that there was no medical reason for him to remain at SCI Laurel Highlands and that transfer to SCI Pittsburgh was in Chruby's best interest because it was closer to his preferred tertiary care facility in Pittsburgh. Chruby alleges, however, that SCI Pittsburgh was not equipped or designed to house inmates with serious medical need like Chruby, and that SCI Laurel Highlands is the only state prison with medical facilities sufficient to prevent repeated hospitalizations of Chruby, including private access to toilet facilities such as a "Port-O-Potty." Chruby alleges that he was transferred or caused to be transferred out of SCI Laurel Highlands by defendants Bearjar, Luther, and Kowalewski because of his constitutionally protected utilization of the prison grievance system and litigation in state and federal courts.

Shortly after his transfer, Chruby presented to medical at SCI Pittsburgh on October 16, 2016, with the following symptoms of pyelonephritis: right lower abdominal pain, vomiting, and bloody urine. He

was hospitalized from October 16, 2016, through October 25, 2016, for treatment of a urinary tract infection and sepsis. He was again hospitalized from October 27, 2016 through November 17, 2016, for treatment of bacteremia due to antibiotic-resistant enterococcus.

When he returned to SCI Pittsburgh, notwithstanding his alleged need to maintain the ability to promptly notify prison staff regarding his condition as he is susceptible to the rapid onset of serious and life-threatening infections, Chruby was locked in a medical ward cell overnight with no working call bells and no way to contact staff other than banging on the door. When Chruby filed a grievance complaining about his placement in and the conditions of the medical ward cell, defendant Wood allegedly responded by demanding that he withdraw the grievance, which Chruby refused to do.

From November 25, 2016, through November 30, 2016, Chruby was again hospitalized due to a complicated urinary tract infection. Chruby was hospitalized once again from December 23, 2016, through January 5, 2017, for treatment of an acute urinary tract infection.

Chruby alleges that he missed 52 prescribed catheterizations between January 17, 2017, and January 26, 2017, because defendants

Shola and Wood—the individuals responsible for ordering and supplying catheters to inmates like Chruby—refused to provide him with an appropriate size catheter. He alleges that they failed to place an order for an appropriate size catheter until January 25, 2017, instead insisting that Chruby use incompatibly-sized catheters that were on-hand. Chruby alleges that Shola and Wood knew that no appropriate size catheters were available at SCI Pittsburgh, but with deliberate indifference to Chruby's serious medical needs, they nevertheless failed to order or otherwise provide him with the needed catheters for 10 days. As a result, Chruby alleges that he was hospitalized yet again from January 26, 2017, through February 22, 2017, with a severe infection—a complicated urinary tract infection.

A short time later, Chruby was again hospitalized from March 2, 2017, through March 10, 2017, for treatment of a complicated urinary tract infection after he presented to the prison doctor complaining of sudden spasm-like chill, fever, nausea, vomiting, and severe pain. He was discharged from the hospital to SCI Pittsburgh under the care of defendants Correct Care and Stramat with an explicit prescription for a specific course of amoxicillin to treat the bacterial infection from which he

was suffering: 500 milligrams three times a day for two weeks, then once a day for long-term suppression. But these defendants allegedly refused to provide Chruby with the prescribed amoxicillin on or about March 22, 2017, and as a result he became ill on April 2, 2017, experiencing nausea, vomiting, fever, shills, hematuria, and rigors due to yet another infection. Chruby was admitted to the hospital, where his temperature rose to more than 103 degrees and he had to be packed into ice. Chruby remained hospitalized through April 12, 2017.

Chruby filed a grievance regarding the inadequacy of his antibiotic treatment. Defendant Wood denied the grievance, endorsing the conduct of the Medical Defendants and advising Chruby that "when you get an infection the doctors will order an antibiotic when necessary."

In January 2017, the Pennsylvania Department of Corrections had announced that SCI Pittsburgh would be closed within the next six months, and it did in fact close at the end of June 2017. On April 19, 2017, before it closed, Chruby was transferred from SCI Pittsburgh to SCI Mercer, where he now remains.

On the evening of May 7, 2017, Chruby presented with a fever of 99.5 degrees, along with right lower quadrant pain. He was monitored

throughout the evening. When he was seen the next morning by defendant Stramat he had a fever of 99.1 degrees. Dr. Stramat allegedly refused to provide Chruby with antibiotics or to perform a urinalysis in accordance with the prescribed medical protocol. Dr. Stramat allegedly delayed sending out a urine culture until May 9, 2017. On May 10, 2017, Chruby was admitted to the hospital with a urinary tract infection and remained there until he was discharged on May 16, 2017.

A few days after his discharge, Chruby was hospitalized again from May 19, 2017, through May 26, 2017. He was hospitalized yet again from May 28, 2017, through June 9, 2017; from June 23, 2017, through June 29, 2017; from July 2, 2017, through July 19, 2017; and from July 28, 2017, through August 3, 2017.

Shortly after this most recent discharge, on August 7, 2017, Chruby was again hospitalized—the final time before filing the complaint in this action. He had become violently ill, vomited repeatedly, had visible blood in his urine and a fever above 99 degrees, and he was unable to keep down oral fluids. Under the individualized medical protocol in place at the time, promulgated in compliance with the 2007 settlement agreement, prison medical staff had been instructed to pre-admit him for any of the following

symptoms:

- Pain in lower right abdomen or pelvic area

- Blood in urine

- Cloudy urine

- Burning urine

- Pressure in pelvic area or right lower abdomen

- Temperature of 99 degrees or above

- Nausea or vomiting

(Doc. 1-8, at 2). But notwithstanding the criteria set forth above, Chruby alleges that, for at least 18 hours, defendants Morgan and Feather refused to send him to the hospital, causing him unnecessary and severe pain, suffering, and emotional distress.

In addition to his transfer away from SCI Laurel Highlands and his allegedly inadequate medical treatment, Chruby also alleges deliberate indifference by the DOC Defendants with respect to his housing conditions. Between December 2014 and March 4, 2015, Chruby was housed in a single cell at SCI Laurel Highlands, during which time he was never hospitalized and he remained infection free. Chruby was moved out of a single cell on March 4, 2015, and except for two weeks in February 2016, he was housed in a cell with other individuals. Chruby alleges that

his housing outside of single cells has resulted in more than 30 hospitalizations since March 2012 for treatment of infections, which he alleges are directly caused by the failure to assign him an appropriate single cell with private access to unshared toilet facilities such as a "Port-O-Potty."

Chruby further alleges that SCI Laurel Highlands is distinct among Pennsylvania state prison facilities—and thus it was designated in the 2007 settlement agreement specifically—because it "serves as the Commonwealth's provider to inmates with special needs; namely, long-term care, personal care, wheelchair, dialysis and geriatric inmates," and it is equipped with a medical unit that cares for inmates who require long-term medical treatment and care, including access to private unshared toilet facilities such as a "Port-O-Potty," the use of which minimizes his risk of infection.

Chruby alleges that it is well-established—and well-known to the defendants—that Chruby's medical condition places him at an elevated risk of developing urinary tract infections, pyelonephritis, and/or urosepsis. He alleges that his housing conditions—sharing a cell and toilet facilities with other individuals—subjects him to a contaminated

environment, exposing him to community acquired bacteria and resulting in his chronic urethral stricture disease.

Chruby alleges that, since 2007, he has required multiple direct visual internal urethrotomys, and in 2012, he underwent a buccal mucosa urethral graft onlay procedure. Both before and after the graft onlay procedure, he suffered from febrile acute pyelonephritis, severe urosepsis, septic shock, and acute kidney injury. He has undergone part one of a medically necessary surgical procedure known as a Johanson perineal urethrostomy, a two-part surgical procedure to redirect the urethra to a new perineum opening in order to bypass the urethral strictures, which procedure would not be necessary if Chruby had not suffered the foregoing infections requiring self-catheterization and hospitalization. Chruby alleges that his ongoing exposure to community acquired bacteria increases his risk of infection, which may negate the positive effects of his recent surgical procedure.

The complaint asserts four separate causes of action under 42 U.S.C. § 1983. In Count One, Chruby asserts a First Amendment retaliation claim against defendant Bearjar, alleging that Bearjar placed a sick inmate in his cell and later transferred him away from SCI Laurel

Highlands in retaliation for his grievance and litigation activities. In Count Two, Chruby asserts an Eighth Amendment deliberate indifference claim against defendants Kowalewski, Shrock, Luther, Wood, Stramat, Shola, Valley, Morgan, and Feather, alleging that they deliberately failed to provide him with necessary medical care and appropriate, medically necessary housing. In Count Three, Chruby asserts an Eighth Amendment deliberate indifference claim against defendant Correct Care, alleging that the harms he suffered arose out of the corporate customs, policies, and practices of Correct Care. In Count Four, Chruby asserts a claim for injunctive relief against defendant Wetzel in his official capacity as Secretary of the Pennsylvania Department of Corrections, alleging that Wetzel has the power and authority to place Chruby in the single cell medical housing necessitated by his medical conditions.

Chruby seeks declaratory and injunctive relief, as well as compensatory and punitive damages from all defendants other than Secretary Wetzel. The injunctive relief Chruby seeks includes an order directing Wetzel to provide Chruby with a "Z" code classification (single cell status), to permanently transfer him to SCI Laurel Highlands and house him in a single cell in the medical unit there, to provide him with

access to unshared toilet facilities, and to comply with the individualized medical protocol previously promulgated.

## II.   MOTION TO TRANSFER

The DOC Defendants have moved to transfer this case to the United States District Court for the Western District of Pennsylvania. They contend that venue in this judicial district is not proper under 28 U.S.C. § 1391(b)(2), and that the case therefore should be transferred to the Western District, where proper venue lies, pursuant to 28 U.S.C. § 1406. In the alternative, the DOC Defendants argue that this Court should exercise its discretion and transfer the case to the Western District pursuant to 28 U.S.C. § 1404(a), because the convenience of the parties and witnesses and the interest of justice, as well as other public and private factors, militate in favor of a transfer.

A motion to transfer a case to another district is a non-dispositive pretrial matter, within the authority of a magistrate judge to hear and decide in the first instance, subject to review by the presiding district judge. *See* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); L.R. 72.2; *Scheafnocker v. Comm'r*, 642 F.3d 428, 433 n.6 (3d Cir. 2011) (per curiam), *vacated on other grounds*, 2012 WL 1854183 (3d Cir. Apr. 24, 2012); *see*

*also Popple Constr., Inc. v. Kiewit Power Constructors Co.*, No. 3:17-CV-1760, 2018 WL 1998314, at *1 (M.D. Pa. Apr. 27, 2018) (Mariani, J.); *McManus v. Giroux*, Civil No. 3:13-CV-1729, 2013 WL 3346848, at *2 (M.D. Pa. July 2, 2013) (Carlson, M.J.) (collecting cases). A party may appeal a non-dispositive order by a magistrate judge by filing written objections within 14 days after service of the order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(a); L.R. 72.2. If a timely appeal is filed, the presiding district judge must review the magistrate judge's findings to determine if any part of the order is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(a); L.R. 72.2.

## A. Transfer for Improper Venue

Section 1406 provides that: "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. §1406(a). Thus, § 1406 "applies where the original venue is improper and provides for either transfer or dismissal of the case." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 878 (3d Cir. 1995). The movant bears the burden of proving that venue is improper. *See Myers v. Am. Dental Ass'n*, 695 F.2d 716, 724–25

(3d Cir. 1982); *Superior Precast, Inc. v. Safeco Ins. Co. of Am.*, 71 F. Supp. 2d 438, 442 (E.D. Pa. 1999).

The statute governing venue is 28 U.S.C. § 1391, which provides in pertinent part:

> A civil action may be brought in—
>
> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).

The DOC Defendants contend that venue in this judicial district is improper under § 1391(b)(2) because only two of the twelve named defendants reside within this judicial district, the Middle District of Pennsylvania, while the other ten are residents of the Western District of Pennsylvania,[8] and because all of the conduct alleged by the plaintiff

---

[8] We note that, as a limited liability company, Correct Care is treated
*(continued on next page)*

occurred in the Western District.

But a plaintiff need satisfy only one of the subparts of § 1391(b) for venue to be proper—*either* (b)(1) or (b)(2) can be used to establish proper venue.[9] *See Superior Precast*, 71 F. Supp. 2d at 443; *Sch. Dist. of Philadelphia v. Pa. Milk Mktg. Bd.*, 877 F. Supp. 245, 249 (E.D. Pa. 1995). Even though venue would be appropriate in the Western District based on (b)(2), it can also be proper here in the Middle District if the requirements of (b)(1) are met. *See Sch. Dist. of Philadelphia*, 877 F. Supp. at 249.

Here, the complaint has alleged that all defendants are residents of Pennsylvania and both Secretary Wetzel and Correct Care reside in the Middle District of Pennsylvania. The DOC Defendants do not dispute these allegations, nor do the other defendants. Thus, venue is proper in this judicial district under § 1391(b)(1), and the question of whether the requirements of (b)(2) are satisfied is simply immaterial. Accordingly, we find that a transfer of this case to the Western District pursuant to 28

---

as a corporation for venue purposes, and thus it is potentially a resident of the Western District also. *See* 28 U.S.C. § 1391(d); *Pippett v. Waterford Dev., LLC*, 166 F. Supp. 2d 233, 238 (E.D. Pa. 2001). It is beyond dispute, however, that Correct Care is a resident of the Middle District, where its principal office is located.

[9] By its terms, of course, (b)(3) only applies if (b)(1) and (b)(2) do not.

U.S.C. § 1406 would be inappropriate.

## B. Discretionary Change of Venue

In the alternative, the DOC Defendants have requested that the case be transferred to the Western District of Pennsylvania pursuant to § 1404(a), which provides that: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a).

"Although § 1404(a) lists three factors impacting the decision to transfer, a district court ruling on a § 1404(a) motion must 'consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum.'" *Superior Precast*, 71 F. Supp. 2d at 445 (quoting *Jumara*, 55 F.3d at 879). While there is no definitive formula or list of factors that must be considered, the Third Circuit has identified several private and public interests that should be considered and weighed in deciding whether to transfer an action under § 1404(a):

> The private interests have included: plaintiff's forum preference as manifested in the original choice; the

defendant's preference; whether the claim arose elsewhere; the convenience of the parties as indicated by their relative physical and financial condition; the convenience of the witnesses—but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

The public interests have included: the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; the public policies of the fora; and the familiarity of the trial judge with the applicable state law in diversity cases.

*Jumara*, 55 F.3d at 879–89 (citations omitted).

Our balancing of these private and public interests is further informed by the following principles:

It is black letter law that a plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request, and that choice should not be lightly disturbed. . . . The decision to transfer is in the court's discretion, but a transfer is not to be liberally granted. The burden is on the moving party to establish that a balancing of proper interests weigh in favor of the transfer, and unless the balance of convenience of the parties is strongly in favor of defendant, the plaintiff's choice of forum should prevail.

*Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970) (citation and internal quotation marks and ellipsis omitted); *see also Jumara*, 55 F.3d at

879; *Superior Precast*, 71 F. Supp. 2d at 445–46.

### 1. Plaintiff's forum preference

As noted above, within the Third Circuit, "a plaintiff's choice of forum is a 'paramount consideration' and 'should not be lightly disturbed in any determination of a transfer request.' However, 'courts give less deference to the plaintiff when he or she chooses a forum outside of his or her state of residence.'" *Barbato v. Greystone Alliance, LLC*, 992 F. Supp. 2d 398, 400 (M.D. Pa. 2014) (Nealon, J.) (citation omitted) (quoting *Shutte*, 431 F.2d at 25, and *Grafton v. Jefferson Capital Sys., LLC*, Civil Action No. 1:11-CV-01006, 2011 WL 4807893, at *2 (M.D. Pa. Oct. 11, 2011) (Conner, J.)); *see also Weber v. Basic Comfort Inc.*, 155 F. Supp. 2d 283, 285 (E.D. Pa. 2001) ("The plaintiff's choice of forum is a significant consideration that should not be disturbed lightly. However, where Plaintiff chooses a forum other than her state of residence, her choice is given less weight.") (citation omitted). Here, although the plaintiff has chosen a different federal judicial district within Pennsylvania, he has nevertheless chosen a forum within his state of residence. Thus his choice of forum remains "a paramount consideration" which "should not be lightly disturbed." *See Shutte*, 431 F.2d at 25; *Barbato*, 992 F. Supp. 2d at 400. This factor weighs

heavily against transfer.

### 2. *Defendants' forum preference*

"The second factor, defendant's forum choice, is 'entitled to considerably less weight than Plaintiff's, as the purpose of a venue transfer is not to shift inconvenience from one party to another.'" *Coppola v. Ferrellgas, Inc.*, 250 F.R.D. 195, 198 (E.D. Pa. 2008) (quoting *EVCO Tech. & Dev. Co. v. Precision Shooting Equip., Inc.*, 379 F. Supp. 2d 728, 730 (E.D. Pa. 2003)). In filing their motion, the seven DOC Defendants have expressed their clear preference for the Western District of Pennsylvania, including Secretary Wetzel, who resides in the Middle District. The remaining five defendants, however, have voiced neither support nor opposition to a transfer, and we note that one of them— Correct Care—resides in the Middle District, where its principal office is located. This factor weighs slightly in favor of transfer.

### 3. *Where the claims arose*

This factor turns on "which forum contains the center of gravity of the dispute, its events and transactions." *Park Inn Int'l, LLC v. Mody Enters., Inc.*, 105 F. Supp. 2d 370, 377 (D.N.J. 2000). Although the reasonableness of the plaintiff's medical treatment may be informed by the

2007 settlement agreement entered into between the plaintiff and Secretary Wetzel's predecessor in connection with litigation before this Court, and by a succession of written medical protocols promulgated in implementation of that settlement agreement, the conduct and events underlying the plaintiff's constitutional tort claims all occurred exclusively in the Western District. This factor weighs in favor of transfer.

### 4. *Convenience of the parties*

This factor requires us to examine "the convenience of the parties as indicated by their relative physical and financial condition." *Jumara*, 55 F.3d at 879. Notwithstanding the plaintiff's clear preference to litigate in this judicial district, geography alone suggests that litigation of this case in the Western District would be physically and financially less burdensome on both plaintiff and the defendants. Neither side has posited any particular physical or financial hardship that might be caused by litigation in either forum, however. This factor weighs slightly in favor of transfer.

### 5. *Convenience of the witnesses*

This factor requires us to examine "the convenience of witnesses— but only to the extent that the witnesses may actually be unavailable for

trial in one of the fora." *Jumara*, 55 F.3d at 879. Generally, this factor

> is a particularly significant factor in a court's decision whether to transfer. There are many different types of witnesses, however, and each one carries a different weight. Fact witnesses who possess firsthand knowledge of the events giving rise to the lawsuit, have traditionally weighed quite heavily in the balance of convenience analysis. Party witnesses or witnesses who are employed by a party, on the other hand, have little impact on the balance of convenience analysis since each party is obligated to procure the attendance of its own employees for trial. Likewise, expert witnesses or witnesses who are retained by a party to testify carry little weight because they are usually selected because of their reputation and special knowledge without regard to their residences and are presumably well compensated for their attendance, labor and inconvenience, if any.

*Coppola*, 250 F.R.D. at 199 (citations, internal quotations, and brackets omitted).

The DOC Defendants note that trial in the Western District would be more convenient for "many of the defendants" because they would be closer to the courthouse. Presumably, most if not all of the defendants would be called upon to testify as witnesses at trial, but the relative convenience of one forum versus another—separately considered under the "relative convenience of the parties" factor above—has little impact on this "convenience of the witnesses" factor because, pursuant to the Court's subpoena power under Rule 45 of the Federal Rules of Civil Procedure, a

party may be compelled to testify at any location within the state where he or she resides, is employed, or regularly transacts business in person. *See* Fed. R. Civ. P. 45(c)(1)(B)(i). Thus, the parties—to the extent they may be called as witnesses at trial—are clearly available for trial in both fora.

The DOC Defendants have not identified any non-party witnesses who would be unavailable or unwilling to testify in this forum. *See Superior Precast*, 71 F. Supp. 2d at 447 ("But [movant] has not shown or suggested that . . . non-party witnesses would be unavailable or unwilling to testify in this district, as it must. Nor has [movant] met its burden of identifying which particular witnesses will benefit from transfer, which it can do by naming witnesses, showing the nature and the materiality of their testimony, and indicating the hardships they would suffer having to testify in this district.") (citation omitted). In the absence of any specific facts or argument on this point, the movants have failed to demonstrate that any non-party witnesses are actually unavailable for trial in this forum.[10]

---

[10] To the extent non-party witnesses from SCI Mercer, SCI Laurel Highlands, or UPMC Shadyside might be expected to offer testimony at trial, we note that all three of these locations fall within 100 miles of the federal courthouse in Pittsburgh. *See* Fed. R. Civ. P. 45(c)(1)(A). But the
*(continued on next page)*

Accordingly, on the record before us, this factor is given no weight.

### 6. *The location of books and records*

This factor requires us to examine "the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." *Jumara*, 55 F.3d at 879. "As recognized by other decisions, . . . 'the technological advances of recent years have significantly reduced the weight of this factor in the balance of convenience analysis.'" *Coppola*, 250 F.R.D. at 200 (quoting *Lomanno v. Black*, 285 F. Supp. 2d 637, 647 (E.D. Pa. 2003)).

The DOC Defendants have articulated no facts or argument at all on this point. Accordingly, on the record before us, this factor is given no

---

fact that all three locations are more than 100 miles from any of the courthouses of the Middle District is not dispositive, because Rule 45 authorizes statewide reach for trial subpoenas, provided the witness's attendance at trial would not cause him or her to incur "substantial expense." *See* Fed. R. Civ. P. 45(c)(1)(B)(ii). One way such expense may be avoided—and the live testimony of the witness at trial secured—is if the party serving the subpoena pays the witness's travel expenses. *See* Fed. R. Civ. P. 45(c) advisory committee note (2013) ("When travel over 100 miles could impose substantial expense on the witness, the party that served the subpoena may pay that expense and the court can condition enforcement of the subpoena on such payment."). Alternatively, the Court could authorize live testimony from a remote location by videoconference. *See id.* ("When an order under Rule 43(a) authorizes testimony from a remote location, the witness can be commanded to testify from any place described in Rule 45(c)(1)."); *see also* Fed. R. Civ. P. 43(a).

weight.

### 7. Enforceability of the judgment

A judgment rendered in either district will be equally enforceable. *See Superior Precast*, 71 F. Supp. 2d at 448; *Coppola*, 250 F.R.D. at 200. Accordingly, this factor is given no weight.

### 8. Practical considerations

This factor requires us to examine "practical considerations that could make the trial easy, expeditious, or inexpensive." *Jumara*, 55 F.3d at 879. There is nothing to suggest that this case would be substantially easier or more expeditious if prosecuted in the Western District. The DOC Defendants contend that it would be less expensive because most of the defendants would be closer to the courthouse, and the plaintiff would be close enough to the courthouse that he would not need to be transferred to another correctional institution for the duration of the trial. In addition, we note that this case is in the early pleading stage, and thus "a transfer will not significantly disrupt the litigation or result in a waste of judicial resources." *Coppola*, 250 F.R.D. at 200. This factor weighs in favor of transfer.

### 9. Court congestion

This factor requires us to examine "the relative administrative

difficulty in the two fora resulting from court congestion." *Jumara*, 55 F.3d at 879. The plaintiff has cited a case noting that the Western District was "operating with four empty District Judge seats, out of a total of ten seats, with three of those seats being vacant for approximately four years." *Iowa Square Realty LLC v. Thota*, Civil Action No. 17-926, 2017 WL 6450899, at *3 (W.D. Pa. Dec. 18, 2017). We note that, at the date of this writing, the Western District is now operating with six vacancies, while this district is at full strength. *See* U.S. Courts, Current Judicial Vacancies, http://www.uscourts.gov/judges-judgeships/judicial-vacancies/current-judicial-vacancies (last updated Aug. 21, 2018). But we further note that the Western District is not among the 71 courts that the Judicial Conference has deemed to be "judicial emergencies." *See* U.S. Courts, Judicial Emergencies, http://www.uscourts.gov/judges-judgeships/judicial-vacancies/judicial-emergencies (last updated Aug. 21, 2018). Accordingly, this factor weighs against transfer, but not heavily so.

### 10. *Local interest*

This factor requires us to examine "the local interest in deciding local controversies at home." *Jumara*, 55 F.3d at 879. Here, the plaintiff is a prisoner who was incarcerated in the Western District at all relevant

times. Other than Secretary Wetzel, the individual defendants all work and reside within the Western District as well. The conduct at issue occurred within the Western District and implicates the management and operation of state prisons located within the Western District. The Western District has a strong interest in protecting its residents and providing a forum for resolution of disputes arising there. *See Superior Precast*, 71 F. Supp. 2d at 448. Accordingly, this factor weighs strongly in favor of transfer.

### 11. *Public policies*

Because both districts are located in the same state, the public policies of both districts are the same. *See Superior Precast*, 71 F. Supp. 2d at 448. Accordingly, this factor is given no weight.

### 12. *Familiarity with applicable state law*

This case involves causes of action derived from federal statutes rather than state law. See *Weber*, 155 F. Supp. 2d at 286–87. Moreover, both districts are located in the same state. *See Superior Precast*, 71 F. Supp. 2d at 448. Accordingly, this factor is given no weight.

### 13. *Balance of convenience*

As previously noted, "unless the balance of convenience of the parties is strongly in favor of defendant, the plaintiff's choice of forum should

prevail." *Shutte*, 431 F.2d at 25. Here, balancing these private and public interests together, we find the balance of convenience of the parties is close to equipoise. Thus, we find that, because the movants have failed to establish that the balance of convenience is strongly in favor of transfer, the plaintiff's choice of forum should prevail.

Accordingly, the DOC Defendants' motion to transfer shall be denied.

## III. MOTION TO SEVER

A motion to sever is also a non-dispositive pretrial matter properly committed to a magistrate judge for consideration. *See* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); L.R. 72.2; *United States v. Cochran*, 682 Fed. App'x 828, 842 (11th Cir. 2017) (per curiam).

The DOC Defendants request that we sever this case into three separate actions, each limited to events or conduct occurring at one of the three different correctional institutions where the plaintiff's claims arose. They contend that claims arising out of events at these three separate institutions are factually distinct from one another and do not arise out of the same transaction or occurrence, and thus they are improperly joined. The plaintiff opposes severance, arguing that all of his claims arise out of the same *series* of transactions or occurrences.

Rule 20 of the Federal Rules of Civil Procedure provides that:

> Persons . . . may be joined in one action as defendants if:
>
>> (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>>
>> (B) any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20(a)(2). "The purpose of Rule 20(a) is to promote trial convenience and expedite the final determination of disputes, thereby preventing multiple law suits." *Russell v. Chesapeake Appalachia, L.L.C.*, 305 F.R.D. 78, 81 (M.D. Pa. 2015) (Brann, J.). "Courts have broad discretion in applying Rule 20 to reduce inconvenience, delay, and added expense to the parties and to the court, and to promote judicial economy. [But t]he policy of liberal application of Rule 20 is not a license to join unrelated claims and defendants in one lawsuit." *Lester v. Rosato*, Civil No. 3:CV-14-1046, 2014 WL 3421072, at *2 (M.D. Pa. July 11, 2014) (Caldwell, J.). Moreover, in the prison litigation context, we are cognizant that "[a]llowing a prisoner to include a plethora of separate, independent claims, would circumvent the filing fee requirements of the PLRA." *Hagan v. Wetzel*, Civil No. 1:17-CV-844, 2017 WL 2215278, at *2 (M.D. Pa. May 19, 2017) (Conner, C.J.). Nevertheless, "[u]nder the Rules, the impulse is

toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *Russell*, 305 F.R.D. at 81.

Rule 21 of the Federal Rules of Civil Procedure provides that: "On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." Fed. R. Civ. P. 21.

> [A] district court has broad discretion in deciding whether to sever a party or claim pursuant to Rule 21. Although Rule 21 is most commonly invoked to sever parties improperly joined under Rule 20, the Rule may also be invoked to prevent prejudice or promote judicial efficiency.
>
> Specific factors to be considered in determining whether severance is warranted include: (1) whether the issues sought to be tried separately are significantly different from one another, (2) whether the separable issues require the testimony of different witnesses and different documentary proof, (3) whether the party opposing the severance will be prejudiced if it is granted, and (4) whether the party requesting severance will be prejudiced if it is not granted.
>
> In addition, a district court has the inherent power to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. A court's inherent power to manage its caseload, control its docket, and regulate the conduct of attorneys before it, provides authority to fashion tools that aid the court in getting on with the business of

deciding cases.

*Marshall v. Pa. Dep't of Corr.*, Civil Action No. 3:12-0351, 2013 WL 1952442, at *2 (M.D. Pa. May 10, 2013) (Mannion, J.) (citations and internal quotation marks omitted).

Contrary to the DOC Defendants' characterization of the plaintiff's claims, we find that these claims arise out of the same series of transactions or occurrences, and thus their joinder in one action is appropriate.

> "Courts generally apply a case-by-case approach when considering whether the facts of several claims constitute a single transaction or occurrence or a series of transactions or occurrences." "'Transaction' is a word of flexible meaning, and may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship."
>
> In determining whether a logical relationship exists between claims, the Third Circuit has stated that courts must engage in "a detailed analysis . . . to determine whether the claims involve: (1) many of the same factual issues; (2) the same factual and legal issues; or (3) offshoots of the same basic controversy between the parties." Courts have found that a "systematic pattern" between tortious events will satisfy the "series of transactions or occurrences" prong. Furthermore, "[c]ourts in this Circuit have found that 'the same series of transactions or occurrences prerequisite under Rule 20 essentially consumes the second requirement that there arise a question of law or fact common to all joined

parties.'"

*Russell*, 305 F.R.D. at 81 (citations omitted).

Here, the plaintiff's peculiar medical conditions and an agreed upon standard of care recorded in a judicially approved settlement agreement between the plaintiff and the head of the state corrections department are the connective tissue between these occurrences. Chruby's claims relate to cell conditions and medical treatment that violate the standard of care adopted in that settlement agreement and acutely impact his health and well-being. The alleged misconduct of the various defendants occurred in three different institutions, but all concern similar and related breaches of the housing and medical protocols prescribed by the settlement agreement. The complaint sufficiently alleges a "systematic pattern" of logically related tortious activity, stemming from the very same basic controversy between the plaintiff and his jailers concerning his specific medical needs, including special accommodations in housing and medical treatment.

Moreover, we find that, in light of the overlapping factual and legal issues involved in all of the plaintiff's claims, severance would not promote judicial efficiency, but rather it would detract from it. The incidents at these three institutions are not significantly different from one another,

but rather appear to constitute a pattern of related incidents. While they implicate some testimony by different witnesses and some different documentary proof, they also are likely to involve a significant number of overlapping witnesses and overlapping documentary evidence. Severing the claims would prejudice the plaintiff insofar as it would require him to conduct three separate lawsuits with significant duplication of both factual and legal issues, and the DOC Defendants have failed to articulate any prejudice they would suffer if severance is not granted.

Accordingly, the DOC Defendants' motion to sever shall be denied.

## IV. CONCLUSION

For the foregoing reasons, the DOC Defendants' motion to transfer (Doc. 15) and their motion to sever (Doc. 17) shall be denied.

An appropriate Order follows.

Dated: August 24, 2018                    *s/ Joseph F. Saporito, Jr.*
                                           JOSEPH F. SAPORITO, JR.
                                           United States Magistrate Judge